# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## 23-3092

---

**UNITED STATES OF AMERICA,**

       **Plaintiff-Appellee,**

    **v.**

**ROBERTO MINUTA, et al.**

       **Defendant-Appellant.**

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

## APPELLANT ROBERTO MINUTA'S RESPONSE IN OPPOSITION TO REPRESENTATIVE JAMIE RASKIN'S *AMICUS CURIAE*

**District Court**
**Cr No. 22-cr-00015-APM**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant*

**INTRODUCTION**

Jamie Raskin, a Member of the U.S. House of Representatives, seeks leave of this Court pursuant to Federal Rule of Appellate Procedure 29 to file an *amicus* brief, the purpose of which seems limited to an effort to persuade this Court to do what the Court is already aware it could do – appoint *amicus* counsel to offer an adversarial view on the Government's motion to vacate the convictions in this consolidated appeal.

In seeking to call into question the legitimacy of the motion filed in this and two related cases, Raskin fails to acknowledge one simple fact – in January and February 2025, the government filed and this Court granted identical motions in dozens, if not more than one hundred, pending appeals, thereby vacating the convictions and remanding the cases back to the district judges with instructions to dismiss the indictments.

Not having raised any objection at that time, Raskin now rushes to file an *amicus* brief that is entirely divorced from the trial record of the three sets of convictions implicated here, and is instead premised on hyperbolic partisan political claims ripped from the headlines and media coverage – while at the same time being polluted by his own contributions to the partisan "findings" of the House's January 6 Special Committee of which he was a member.

This Court should decline to consider Raskin's filing. But even if this Court does entertain the claims made therein, the suggestion for court-appointed *amicus* counsel to oppose the motions is unwise and likely foreclosed by prior decisions of this Court and the Supreme Court. It would require granting such counsel access to, and the time to review, literally hundreds of thousands if not more than a million pages or records that relate to the handling of these cases by the Department of Justice under the prior Administration. The costs in time, money, and further delays to Defendants-Appellants' rights all weigh against Raskin's request.

## STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

On April 14, 2026, the United States filed an unopposed motion asking this Court to vacate the final judgments of conviction entered against four Defendants-Appellants in this consolidated appeal, and eight other Defendants-Appellants in two related cases. The motions also request the cases be remanded back to the district court with instructions to dismiss the indictments. Defendants-Appellants fully support that motion.

The timing of the motions, coming almost three years after sentencing, is not in any way suspicious as they coincide with the rapidly approaching dates for filing of opening briefs in the two consolidated-appeals involving the Oath Keeper defendants. These eight Defendant-Appellants were jointly indicted but severed for trial.

With those filings approaching, and with a well-informed view of what issues were likely to be presented on appeal, the appellate staff of U.S. Attorney for the District of Columbia chose to move to vacate the convictions. This is the same procedural mechanism employed by the government for all other cases pending on appeal at the time of President Trump's decision to end the prosecution of all remaining cases arising out of the events of January 6 pending in this Court and the District Court on January 20, 2025.

Late on Friday, April 17, 2026, Representative Raskin filed the instant motion, attaching a proposed *amicus* brief, and asking the Court to (1) grant him leave to file as *amicus curiae* under FRAP 29 and (2) for this Court to exercise its "inherent authority" to appoint yet another *amicus* counsel to submit briefing in opposition to the government's motions. Raskin's central thesis is that, because both the Government and Defendants-Appellants are aligned in seeking vacatur, "no party before this Court will be defending the judgments below," and that the Court

therefore must appoint independent counsel to ensure a full adversarial presentation. He relies primarily on *In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020) (en banc), *United States v. Adams*, 777 F.Supp.3d 185 (SDNY 2025), and *Young v. United States*, 315 U.S. 257 (1942).

Raskin's request should be denied in full. His stated interest is general, institutional, and political rather than case-specific. The cases he cites are distinguishable and do not support the relief he seeks in a post-trial, post-sentencing posture.

The four consolidated appeals in this matter are from the Oath Keepers #2 trial, consolidated in No. 23-3092, and are on behalf of Defendants-Appellants Roberto Minuta, Edward Vallejo, Joseph Hackett, and David Moerschel.

In total, the consolidated appeals in the two Oath Keeper cases involve eight Defendants-Appellants. The trials consumed hundreds of hours of court time, involved thousands of pages of exhibits, and the testimony of several dozen witnesses -- with a record including a combined total transcripts estimated to be in excess of 10,000 pages.

After several extensions of time, the eight Defendants-Appellants were in the final stages of preparing to file opening briefs with this Court.   Prior to that happening, the Government – without prior consultation and with only a few hours of notice to Appellants' counsel -- filed the motions to vacate now pending.

## ARGUMENT

### I.    Raskin's Motion for Leave to File as *Amicus Curiae* Should Be Denied

FRAP 29(a)(2) permits an *amicus* brief only "by leave of court" unless all parties consent. Representative Raskin's motion does not indicate whether he sought the consent of the parties – he did not make any such request to counsel for the Defendants-Appellants here.

The motion must "state the movant's interest" and "the reason why an *amicus* brief is desirable and why the matters asserted are relevant to the disposition of the case."

Raskin's motion asserts that his interest is "institutional" based on his current position as Ranking Member of the House Judiciary Committee with oversight of both the Department of Justice and the Judicial Branch.

He states also that his interest is "personal" by virtue of his presence in the Capitol on January 6, and the threat to his welfare and safety he claims was the result of the actions of the Defendants-Appellants.[1]

While these interests are understandable on a human level, they are far too general and political to justify granting him leave in this proceeding. Representative Raskin represents no party in the pending direct appeal, and he offers no persuasive argument for why his judgment is superior to the Executive branch responsible for prosecuting this matter and defending the convictions on direct appeal. Courts routinely deny *amicus* participation when the movant offers nothing beyond what the parties themselves can provide. See, e.g., *Automobile Club of N.Y. v. Port Auth. of N.Y. & N.J.*, No. 21-1234 (2d Cir. 2021) (denying leave where movant's interest was "general" rather than "particular").

---

[1]    Representative Raskin and other House members were evacuated from the Capitol no later than 2:25 pm. While Rep. Raskin may have a "personal" interest based on a feeling of having been menaced by the crowd that began entering the Capitol at approximately 2:13 pm, that did not involve any of the four defendants-appellants in this consolidated appeal. Emblematic of Rep. Raskin's factual claims being divorced from reality as reflected in the trial record, defendants Hackett and Morschel first entered the Capitol at approximately 2:38 pm as part of what the Government called "Stack One." Defendant Minuta first entered the Capitol at approximately 3:14 pm with "Stack Two." Defendant Vallejo never entered the Capitol. These times were all established by CCTV video with time-stamps that were admitted as exhibits in the OK #2 trial.

The parties are fully capable of addressing any concerns this Court may have over the government's exercise of prosecutorial discretion and the "interests of justice" reflected in bringing the entire episode – including DOJ's response to it – to a final close.  Raskin's filing introduces no new legal authority or factual material not otherwise known to the parties and/or the Court. Granting leave would serve only to politicize an otherwise straightforward motion and risks turning the appellate process into a forum for political advocacy by a prominent member of the opposition party to the party that now in control of the Executive branch.

II.     **There Is No Basis for the Court to Appoint Independent *Amicus Curiae* – The History of *Amicus Curiae* Practice Confirms the Extraordinary Nature of Rep. Raskin's Request**

As a basis for his request that the Court appoint a court-chosen *amicus* Rep. Raskin cites the Court's "inherent authority" along with relying on this Court's failure to prohibit the district court's use of such counsel in *In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020) (en banc).  He also cites the out of circuit district court opinion in *United States v. Adams*, 348 F.R.D. 408 (S.D.N.Y. 2025). Both cases are materially distinguishable and do not support Rep. Raskin's motion here.

The very concept of *amicus curiae* has a long and well-documented history that Raskin's motion ignores. Traditionally, an *amicus* was a neutral "bystander" or "friend of the court" whose role was strictly limited to providing the judge with information the court lacked; to point out manifest errors in the record; or to protect the rights of third parties who might be affected by a collusive judgment -- *amicus* was never intended to act as a partisan advocate for one side or the other.  See generally Krislov, *The Amicus Curiae Brief: From Friendship to Advocacy*, 72 Yale L.J. 694 (1963); Lowman, *The Litigating Amicus Curiae*, 36 Am. U. L. Rev. 815 (1987).

This historical understanding persisted in early American practice. The first *amicus curiae* brief in the U.S. Supreme Court did not appear until 1823 (Henry Clay in *Green v. Biddle*,

21 U.S. 1), and even then, it was viewed as an exceptional, non-adversarial intervention. It was not until the late 1960s and 1970s—with the rise of public-interest litigation—that the "litigating amicus" emerged as a partisan tool.

In criminal cases, court-appointed *amici* have been even rarer. They appear almost exclusively in narrow pretrial or habeas contexts, and virtually never in direct appeals of final convictions.  See, e.g., *United States v. Thorpe*, No. 23-3027 (D.C. Cir. 2025) (appointing *amicus* only when the Government refused to defend the district court's denial of a Rule 48(a) motion). No precedent supports Raskin's request here that *amicus* should be heard from for the specific purpose of litigating against the interests of criminal defendants.

Raskin's attempt to stretch the pretrial *Flynn* and *Adams* decisions into this vastly different context is therefore not only wrong—it is historically baseless. *Flynn* involved a Rule 48(a) motion following a guilty plea but before sentencing. This Court sitting *en banc* denied a petition for writ of mandamus to block appointment of an *amicus* counsel, issuing a narrow decision that did not reach the merits due to a procedural failure by the petitioner to make the requisite showing there was "no other adequate means to attain the relief he desires."  *In Re Flynn*, 973 F.3d at 978.  This procedural holding is not a precedent for the proposition that adversarial briefing used by the district court there is necessary to resolving an unopposed post-conviction vacatur request.

*Adams* also involved a pretrial motion to dismiss where the defendant still enjoyed the "presumption of innocence."  *Adams* involved facts where the leadership of the Southern District of New York U.S. Attorney's Office resigned rather that seek to dismiss the indictment as directed by the political leadership of DOJ.  They resigned based on their view that dismissing the indictment amounted to an unethical quid pro quo with the defendant who was the Mayor of

New York City.  The former leadership went public with their reasons for resigning and their objections to the directions given to dismiss the indictment.  The District Court appointed *amicus* counsel to further develop the factual record, and to provide guidance as to the implications of any ethical concerns with regard to the pending motion to dismiss after it was filed by other DOJ officials.  But the most compelling reason Adams is of no help here is reflected in the following holding taken from the opinion:

> The Court's decision is also not about, and the Court expresses no opinion on, whether the case against Mayor Adams "should" continue based on the kinds of factors that a prosecutor might typically consider in bringing a case—including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States*, 470 U.S. 598, 607 (1985). ***Courts are "particularly ill-suited" to weigh such factors, id., and this Court declines to wander into that thicket. In our constitutional system, that decision is left to a political branch of our government, which is ultimately accountable for its actions to the people.*** Part of this Court's limited role under Rule 48(a) is to shine a light on the reasons that DOJ has decided to dismiss this case, leaving the most important judgment to the public.

United States v. Adams, 777 F.Supp.3d at 193. (Emphasis added).

Neither case supports Raskin's request here. This case sits at the opposite end of the spectrum -- following the conclusion of the trial phase and sentencings in a criminal case.[2]  The

---

[2] While a technical issue, Raskin's motion repeatedly refers to the Defendants-Appellants convictions as being "Final."  In federal criminal matters, a conviction is not "final" until all appeals of right have been exhausted, or the time to file notice for such relief has expired.  In *Clay v. United States*, 537 U.S. 522, 567 (2003) a unanimous Supreme Court held:

> Here, the relevant context is postconviction relief, a context in which finality has a long-recognized, clear meaning:  Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.

Because the convictions of the Defendants-Appellants were timely appealed and those appeals remain pending in this Court, their convictions are not "Final."

balance has shifted towards finality and deference to the Executive's decision to forgo defense of or further enforcement of the convictions in the lower court.

Further, there are easily understood reasons why the government, whether articulated or not in its motions, might choose to not contest an appeal by a defendant in a criminal case following a conviction. One uncommon but not unheard circumstance is where the government concedes what it sees as a legal error by the judge below that renders the conviction unsound, with DOJ unwilling to defend it as an ethical matter. In this situation a Circuit Court will sometimes see the need to appoint *amicus* counsel to defend the institutional interests of the lower court – it may turn out that the lower court was correct on the question of error and the government is wrong in making a concession.

But there is a related concept in play here, captured by the axiomatic phrase "Bad facts make bad law." That concept has already impacted the government in this and more than 340 other cases related to the events of January 6 as a result of government's decision-making as reflected in the Supreme Court's decision in *Fischer v. United States*, 603, U.S. 480 (2024).

There the Supreme Court held that the application of 18 U.S.C. Sec. 1512(c)(2) – the "catch-all" obstruction provision – only applied in a narrow factual circumstance that was not found in the theory employed by the government in its charging decisions, prosecutions, and sentencings prior to the Court's decision. For more than three years the government interpreted the "catch-all" provision expansively to serve as a "dragnet" of any conduct, of whatever kind, that it could convince the trier of fact to have "obstructed" the Congressional proceedings on January 6. In *Fischer* the Supreme Court repudiated this reading of the statute and held that the plain meaning meant it applied only where there the allegedly criminal conduct was intended to impair the integrity or availability of evidence for use in the "official proceeding" in question.

Following the decision in *Fischer*, the Department of Justice reported that of the 1,427 individuals who were charged in connection with the January 6 riot, 342 were charged with a violation of Sec. 1512(c)(2). Of those, 71 had not yet faced trial at the time of the Supreme Court's decision in *Fischer*.

The Supreme Court remanded *Fischer* for further proceedings consistent with its narrow interpretation of the statute. That left the government with the option to retry any cases on that narrower theory as contrasted than the "dragnet" approach it used to obtain convictions under its expansive definition.

It is worth noting that in the seven months that followed between the Supreme Court's decision in *Fischer* and the issuance of pardons by President Trump on January 20, 2025, the Department of Justice under the stewardship of the prior Administration did not attempt to retry a single case remanded to the district court under the narrow interpretation of Sec. 1512(c)(2). Further, in the 71 cases pending trial when *Fischer* was decided, the government moved to dismiss the Sec. 1512(c)(2) counts rather than prosecute them at trial.

A better justification for questioning the decision-making of the Department of Justice in how it pursued these cases under the prior Administration would be hard to imagine.

By pushing the expansive and previously untried "dragnet" application of Sec. 1512(c)(2), the government ended up with an adverse outcome in the Supreme Court that significantly narrowed what had been, up to that point, an effective threat that might have dissuaded obstructive behavior.

"Bad facts make bad law" becomes embodied in unfavorable appellate outcomes that the Department of Justice must thereafter grapple with in future cases. In fact, the adverse outcome in *Fischer* was the seventh Supreme Court decision over a period of 19 years where the

Department of Justice lost -- unanimously in five of the seven cases – after advocating in the District and Circuit Courts for an expansive application of a criminal "obstruction" statute. Each time the problem was application of a statute to set of facts seemingly far beyond that contemplated by Congress.[3]

The pending consolidated appeals here involve significant legal questions with potential far-reaching consequences if there are adverse decisions as to application of 18 U.S.C. Sec. 2384 (Seditious Conspiracy) and 18 U.S.C. Sec. 272 (Interference with Officers) to the events of January 6, and any constitutional challenges to either statute "as applied."

One reading of the Government's decision to file motions to vacate rather than defend the the trial outcomes below would be that it eliminates the risk of another *Fischer*-like outcome on other important issues. An adverse appellate decision here, with several issues of first impression likely to be presented, could have lasting effects on future cases much like as what happened with *Fischer*. The calculation might be that it is better to not risk such an outcome trying to defend the decision-making processes of the prior administration.

III.     ***Young v. United States* Is Factually and Procedurally Inapposite and at Most Recognizes That an Independent Judicial Review of the Record – Not Adversarial Briefing – Is Sometimes Appropriate.**

Raskin claims the "principle" found in *Young v. United States*, 315 U.S. 257, 258-59 (1942), should control here based on the Supreme Court's view that "Our obligation is to examine independently the errors confessed." But nothing suggests that such a review must also

---

[3] The six cases prior to *Fischer* were *United States v. Arthur Anderson*, 544 U.S. 696 (2005)(9-0 in favor of defendant); *United States v. Skilling*, 561 U.S. 358 (2010)(6-3 in favor of defendant); *Yates v. United States*, 574 U.S. 528 (2015)(9-0 in favor of defendant); *United States v. McConnell*, 579 U.S. 550 (2016)(8-0 in favor of defendant); *Kelly v. United States*, 590 U.S. 391 (2020)(9-0 in favor of defendant); and *United States v. Percoco*, 598 U.S. 319 (2023)(9-0 in favor of defendant).

include court-appointed counsel serving in an adversarial role as requested by Raskin. In fact, such a reading is not supported by *Young*.

In *Young*, the Solicitor General conceded *reversible error* by the district court on direct appeal and asked the Supreme Court to reverse the conviction based thereon. Granting such a motion without any inquiry into the asserted grounds could be construed as an endorsement of the Government's finding of fault with the trial court's decision-making.  The Court refused to issue such an endorsement of the existence of error automatically. It explained:

> "The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed. … The public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding. That interest is entrusted to our consideration and protection as well as that of the enforcing officers. Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties."

*Id.* at 258–59 (emphasis added).

It wasn't the propriety of the motion that concerned the Supreme Court, it was the attribution of reversible error to a trial judge not able to defend his decision.

*Young* stands only for the narrow proposition that when the Government attributes reversible error to the district judge, the appellate court must satisfy itself that such is the case through an independent review of the record. It does *not* extend to the claim made here by Raskin – that a post-conviction motion to vacate should only be decided after a court-appointed amicus provides an adversarial process.

*Young* does not mean this Court is incapable of making any such inquiries without the assistance of *amicus* – indeed there was no *amicus* involved in *Young*.

Subsequent Supreme Court decisions have confirmed *Young*'s limited scope. In *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977), the Court reaffirmed the need for court review but granted the Government's motion to dismiss where there was no suggestion of bad faith present in the government's request for dismissal.  Lower courts have followed suit, applying *Young* only to require scrutiny of the Government's *reasons*, not the appointment of *amicus* counsel to advance a position adversarial to the position of the government.  See, e.g., *United States v. Blaszczak*, 56 F.4th 230, 242 (2d Cir. 2022); *United States v. Russell*, 600 F.3d 631, 636–37 (D.C. Cir. 2010).

The Government has not suggested any error here. The requested vacatur establishes no controlling legal authority on any contested issue in the case as would be true if the consolidated appeals here were resolved on their merits.  It does not attribute error to the trial court and it does not seek to call into question the trial court's decisions on controversial questions – some of first impression.

The grounds offered by the government for the motion rests squarely on the exercise of prosecutorial discretion and what the Department of Justice under the current administration views as to the interests of justice when examining the decisions of the past administration. There is no legal obligation imposed upon the current Department of Justice to endorse and validate the decision-making of the Department of Justice under a prior administration de facto by defending that decision-making on appeal.  Indeed, here no such obligation is imposed given the Supreme Court's treatment of related prosecutions under *Fischer* where the errors in the decision-making of the prior Administration are manifest.

IV.    **This Court's Decision in *Fokker Services* Forecloses the Kind of "Inherent Authority" Review That Would Consider the "Interests of the Public" as Urged By Rep. Raskin.**

This Court's decision in *U.S. v. Fokker Services B.V.*, 818 F.3d 733 (D.C. Cir. 2016) is controlling here. This Court's admonition of the district court in *Fokker* was direct and applies with equal force here. It is not a question of what the "inherent authority" of a court allows it to do – it is a question of what the constitutional framework creating a "separation of powers" prohibits it from doing.

Before looking at that language, it is instructive to understand precisely what this Court was reviewing in *Fokker*:

> According to the court, approval of an [Deferred Prosecution] agreement in which the defendant had been "prosecuted so anemically for engaging in such egregious conduct for such a sustained period of time and for the benefit of one of our country's worst enemies" would "promote disrespect for the law." [*United States v. Fokker Services, B.V.*, 79 F. Supp. 3d 160, 167 (D.D.C. 2015)]. The court further noted that certain employees had been permitted to remain with the company; that the agreement contained no requirement for an independent monitor; and that the amount of the fine failed to exceed the revenues Fokker gained from the illegal transactions. *Id*. at 166. Based on those considerations, the court rejected the DPA as an "[in]appropriate exercise of prosecutorial discretion."

*Id*. at 167.

The complaints of the district court in *Fokker* regarding the DPA agreed to by the government are quite similar to what Raskin suggests an *amicus* appointed to take an adversarial position should advocate for here in opposition to the governments motion, i.e., that as an exercise of prosecutorial discretion the motions are contrary to the public's interest.

The key to this Court's ruling in *Fokker,* however, is that the scope of any such "discretion" invoked by the Judicial Branch – whether by statute, Rule, or based on "inherent authority" as urged by Raskin here -- must be evaluated against the backdrop of the "separation of powers" framework that places certain discretionary decision-making exclusively within the

Executive Branch.  While this Court need not be a "rubber stamp" in granting a motion to vacate a conviction, that does not mean this Court is able to invoke its "inherent authority" as urged by Raskin to review the reasons proffered for a motion premised on the exercise of prosecutorial discretionary.

This Court noted in *Fokker* "The district court's order marks the first time any federal court has denied a joint request by the parties to exclude time pursuant to a DPA…." *Fokker Services at 737*.  Since both parties were aligned in opposition to the district court, this Court appointed *amicus* to present arguments defending the district court's order.  The outcome in *Fokker* makes appointment of *amicus* counsel here unnecessary, as this Court held:

> Decisions to initiate charges, or to dismiss charges once brought, "lie[] at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986).

*Id*. at 818 F.3d at 741.

This Court went on:

> Indeed, "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967).

*Id*.

And finally:

> As with the "leave of court" language in Rule 48(a) and the "public interest" authority in the Tunney Act, we construe the "approval of the court" language in § 3161(h)(2) in a manner that preserves the Executive's long-settled primacy over charging decisions and that denies courts substantial power to impose their own charging preferences.

*Id.* at 818 F.3d at 743.

Rep. Raskin's filing acknowledges that Fed. R. Crim. P. 48(a) does not apply to this post-trial appeal.  But he seeks appointment of an *amicus* counsel by citing case law interpreting that

Rule's "with leave of court" requirement – which he imports here under this Court's "inherent powers" -- for the purpose of subjecting the government's motions to vacate to an inquiry as to whether they are "contrary to the public's interest."  But this Court's decision in *Fokker* forecloses such an analysis.

Rule 48(a) provides that "[t]he government may, **with leave of court**, dismiss an indictment, information, or complaint." The rule was adopted in 1944 to curb the common-law power of prosecutors to enter a *nolle prosequi* at will. Its "leave of court" requirement was designed primarily to prevent prosecutorial harassment of defendants (repeated charging and dismissing) and, secondarily, to guard against politically motivated or corrupt dismissals that disserved the public interest. See *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) (principal object was "to protect a defendant against prosecutorial harassment").  But even in *Rinaldi* the Supreme Court expressed some lack of understanding behind the clause and expressly declined to establish its precise meaning and reach.  While some courts have cited Footnote 15 as supporting the kind of inquiry sought by Rep. Raskin, that is a misreading of Footnote 15 that extracts one observation made by the Court but ignoring the import of the note as a whole. Footnote 15 reads in its entirety as follows:

> The words "leave of court" were inserted in Rule 48(a) without explanation. While they obviously vest some discretion in the court, the circumstances in which that discretion may properly be exercised have not been delineated by this Court. The principal object of the "leave of court" requirement is *apparently to protect a defendant* against prosecutorial harassment, e.g., charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection. [Citations omitted]. But the Rule has also been held *to permit the court to deny a Government dismissal motion* to which the defendant has consented *if the motion is prompted by considerations clearly contrary to the public interest*. See *United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975); *United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973). ***It is unnecessary to decide whether the court has discretion under these circumstances, since, even assuming it does, the result in this case remains the same.***

Id. at 29.  (Emphasis added).

The Supreme Court expressly states that the scope of discretion conferred by the "with leave of court" phrase has never been established. It expressly declined to endorse the view that the "with leave of court" provision permits a court to deny a motion to dismiss on the basis that such a motion was contrary to an undefined notion of the "public's interest." The Court noted that other courts have suggested such an inquiry is allowed as part of the "with leave of court" condition but expressly declined to reach the issue as it was unnecessary to the result.

Rep. Raskin cites to the same cases noted by the Supreme Court in Footnote 15, where a "contrary to public interest" inquiry was done with respect to a motion to dismiss. But a close examination of the facts of those cases shows them to be of no help to Rep. Raskin here.

A *meaningful* review of this Court's prior decision in *Ammidow*n – compared to the bare citation without analysis in Raskin's filing – makes clear how unhelpful it is, even setting aside the fact that it came 43 years prior to *Fokker Services*, calling into question its vitality where they appear inconsistent.

The language in *Ammidown* that is cited as support for a claim that a court should review the government's exercise of prosecutorial discretion is dicta. *Ammidown* did not involve Rule 48(a) — it involved Rule 11. The defendant was charged with first-degree murder, but a disposition was reached pursuant to Rule 11 where the defendant agreed to plead guilty to second-degree murder, with the first-degree murder charge to be dismissed by the court upon motion by the government. However, the district court did not believe second-degree murder was an appropriate charge based on the facts, and refused to dismiss the first-degree murder charge. The question before this Court was the extent of the trial court's discretion to refuse to dismiss a charge under Rule 11 as a term of a plea agreement.

This Court surveyed other cases involving Rule 48(a), and what other courts held with respect to judicial discretion to refuse to dismiss under Rule 48(a) given its "with leave of court" requirement.  This Court made a series of observations about the extent of judicial discretion under Rule 48(a) from the holdings of those other cases, and then analogized them to Rule 11.  But after *Ammidown*, this Court's general observations about Rule 48(a) have now come to be cited as a precedential holding as to Rule 48(a) even though the meaning of Rule 48(a) was not before this Court in *Ammidown*.  This Court's observations about Rule 48(a), the meaning of "with leave of court," and the extent of judicial discretion conferred by that phrase were not necessary to decide a whether a district court had discretion to deny to a dismissal motion under Rule 11.

It is true that *Fokker Services* did not involve the review of the "inherent authority" of a federal appeals court as is being urged here by Raskin, just as *Ammidown* did not involve any issues under Rule 48(a).

But *Fokker Services* does apply because any exercise of judicial discretion for the purpose of reviewing the Executive's exercise of prosecutorial discretion is limited by the broader constitutional inhibitor of "separation of powers."  "Inherent authority" is a no more valid basis to intrude on the Executive than the authority from Congress conferred by statue (*Fokker*) or the Rules of Criminal Procedure (*Rinaldi* and *Ammidown*).[4]

---

[4]  Rep. Raskin also cites as support for his position two Fifth Circuit cases, *United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975), and *United States v. Salinas*, 693 F.2d 348 (5th Cir. 1982). They also address pretrial dismissals under Rule 48(a).  But both stress that courts may deny leave only in "extraordinary" circumstances where the prosecutor's actions betray the public interest.  Neither address the "separation of powers" rationale that underpins *Fokker Services* and are therefore inapposite and should be disregarded by this Court.

V.    **Practical and Equitable Considerations Strongly Favor Denial of the Relief Raskin Seeks.**

Granting Rep. Raskin's suggestion to appoint *amicus* counsel would be not only legally unsupported but practically disastrous.  These cases have already consumed an extraordinary amount of executive, judicial, and party resources.  On the eve of opening briefs being filed across three separate trials with different records, spanning an aggregate of more than nine months, tens of thousands of pages of transcripts, testimony from dozens of witnesses, and the admission of thousands of trial exhibits, Rep. Raskin now urges this Court to appoint *amicus* counsel to canvas all that material to uncover ulterior motives behind the exercise of prosecutorial discretion in a manner contrary to the public's interest.  How could such a recommendation be made to this Court without a full understanding of the cases presented by the Department of Justice under the prior Administration that the current Department of Justice's unwillingness to stand behind them?  And the suggestion to do so is premised entirely on speculation, i.e., that some nefarious partisan motive is behind the motions rather than a conclusion that the decision-making of the prior Administration in its approach cannot be supported or legally defended on direct appeal.

The Executive Branch has determined that defending the trials on the merits in this Court is not in the interests of justice.  The Executive is not pointing to any error or fault on the part of the trial court below that suggests the need for defense of the trial court by *amicus* counsel.  It is a simple exercise of prosecutorial discretion to not expend further time and resources to defend the outcomes in a forum where the Defendant-Appellants have a constitutional right to raise their challenges to those outcomes.

**CONCLUSION**

Representative Raskin's motion is a transparent attempt to hijack a routine exercise of prosecutorial discretion and turn it into a political referendum on January 6. The law, history, and equities all point in one direction: the motion for leave and the request for a court-appointed amicus should both be denied. This Court should let the Government's motion proceed without interference by third party detriment of the prosecutorial authority vested in the Executive by the Constitution, and rights of the Defendants-Appellants.

**CERTIFICATE OF COMPLIANCE**

1. I hereby certify that this motion complies with the type-volume limitation of Fed. R. App. P. (27)(d)(2)(A) of the Federal Rules of Appellate Procedure. As measured by the undersigned's word processing system used to prepare this motion, this motion contains 5953 words.

2. This document complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in 14 point proportionally spaced roman style typeface (Times New Roman).

April 23, 2026                                  */s/ William L. Shipley, Esq.*
                                               William L. Shipley
                                               Counsel for Defendant-Appellant
                                               Roberto Minuta

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF system which will send notification of such filing.

April 23, 2026                                  */s/ William L. Shipley, Esq.*
                                               William L. Shipley
                                               Counsel for Defendant-Appellant
                                               Roberto Minuta